**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARIZONA DREAM ACT COALITION; CHRISTIAN JACOBO; ALEJANDRA LOPEZ; ARIEL MARTINEZ; NATALIA PEREZ-GALLEGOS; CARLA CHAVARRIA; JOSE RICARDO HINOJOS,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>JANICE K. BREWER, Governor of the State of Arizona, in her official capacity; JOHN S. HALIKOWSKI, Director of the Arizona Department of Transportation, in his official capacity; STACEY K. STANTON, Assistant Director of the Motor Vehicle Division of the Arizona Department of Transportation, in her official capacity,<br><br>*Defendants-Appellants*. | No. 15-15307<br><br>D.C. No. 2:12-cv-02546-DGC<br><br>ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted July 16, 2015
Pasadena, California

Filed April 5, 2016
Amended February 2, 2017

Before: Harry Pregerson, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Order;
Dissent to Order by Judge Kozinski;
Opinion by Judge Pregerson;
Concurrence by Judge Berzon

## SUMMARY[*]

### Civil Rights

The panel amended its prior opinion filed on April 5, 2016, appearing at 818 F.3d 901 (9th Cir. 2016), denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions for rehearing will be accepted.

Dissenting from the denial of rehearing en banc, Judge Kozinski, joined by Judges O'Scannlain, Bybee, Callahan, Bea and N.R. Smith, disagreed with the conclusion that President Obama's program, created by an executive memorandum, preempted state law. Judge Kozinski noted that Congress never approved the deferred-action program, but rather the President adopted it on his own initiative after Congress repeatedly declined to pass legislation that would

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

have authorized a similar program. Judge Kozinski stated that the panel opinion failed to show that Congress evinced a "clear and manifest purpose" to delegate to the executive branch the authority to preempt state law. Judge Kozinski stated that Arizona's control over its drivers' licenses was well within the mainstream of the state's police power.

The panel affirmed the district court's summary judgment in favor of plaintiffs and affirmed the district court's order entering a permanent injunction that enjoined Arizona's policy of denying Employment Authorization Documents issued under the Deferred Action for Childhood Arrivals program as satisfactory proof of authorized presence under federal law in the United States.

Plaintiffs are five individual recipients of deferred action under the Deferred Action for Childhood Arrivals ("DACA") program, and the Arizona DREAM Act Coalition. DACA recipients are noncitizens who were brought to this country as children. The DACA program, authorized by a federal executive order, permits recipients to remain in the United States for some period of time as long as they meet certain conditions.

The panel found that DACA recipients are similarly situated in all relevant respects to other noncitizens eligible for drivers' licenses under Arizona's policy. The panel found that Arizona's refusal to rely on Employment Authorization Documents from DACA recipients for purposes of establishing eligibility for drivers' licenses may well violate the Equal Protection Clause for lack of a rational governmental interest justifying the distinction relied upon. The panel, however, applied constitutional avoidance and found that it could reach the same result on the ground that

the Immigration and Nationality Act occupies the field of Arizona's classification of noncitizens with regard to whether their presence is authorized by federal law. The panel concluded that the Immigration and Nationality Act preempts states from engaging in their very own categorization of immigrants for the purpose of denying some of them drivers' licenses. Because Arizona created a new immigration classification when it adopted its policy regarding driver's license eligibility, it impermissibly strayed into an exclusive domain that Congress, through the Immigration and Nationality Act, delegated to the executive branch.

Concurring, in light of the dissent from the denial of rehearing en banc, Judge Berzon stated that she joined the panel opinion in full, but wrote separately to emphasize that the law that has preemptive power over Arizona's policy is Congress' conferral of exclusive authority on the executive branch to defer removal of individuals who lack legal status and to authorize them to work while temporarily permitted to remain. Additionally, Judge Berzon stated that the preemption issues ultimately decided in this case could be viewed as embedded in the equal protection analysis, given the historical and conceptual overlap between equal protection and preemption concerns in cases involving state laws that affect immigrants.

## COUNSEL

Dominic Draye (argued), Deputy Solicitor General; John Robert Lopez, IV, Solicitor General; Office of the Attorney General, Phoenix, Arizona; Timothy Berg, Sean Hood, and Douglas C. Northup, Fennemore Craig P.C., Phoenix, Arizona; for Defendants-Appellants.

Karen Tumlin (argued), Shiu-Ming Cheer, Nicholás Espíritu, Linton Joaquin, and Nora A. Preciado, National Immigration Law Center, Los Angeles, California; Tanya Broder, National Immigration Law Center, Berkeley, California; Jorge Martin Castillo and Victor Viramontes, Mexican American Legal Defense Educational Fund, Los Angeles, California; Lee Gelernt, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; James Lyall and Daniel J. Pochoda, ACLU of Arizona, Phoenix, Arizona; Jennifer C. Newell, Michael K.T. Tan, and Cecillia D. Wang, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; for Plaintiffs-Appellees.

Dale Wilcox and Michael M. Hethmon, Washington, D.C., as and for Amicus Curiae Immigration Reform Law Institute.

Lindsey Powell, United States Department of Justice, Washington D.C., for Amicus Curiae United States of America.

John S. Miles, Jeremiah L. Morgan, William J. Olson, Robert J. Olson, and Herbert W. Titus, William J. Olson P.C., Vienna, Virginia; Michael Connelly, U.S. Justice Foundation, Ramona, California; for Amici Curiae English First Foundation, English First, U.S. Justice Foundation, Gun Owners Foundation, Gun Owners of America, Inc., and Conservative Legal Defense and Education Fund.

**ORDER**

The court's opinion filed on April 5, 2016, appearing at 818 F.3d 901 (9th Cir. 2016), is hereby amended. An amended opinion, including a concurrence by Judge Berzon, is filed herewith.

Judges Berzon and Christen voted to deny the petition for rehearing en banc, and Judge Pregerson so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**, and no further petitions for rehearing will be accepted.

---

Circuit Judge KOZINSKI, with whom Circuit Judges O'SCANNLAIN, BYBEE, CALLAHAN, BEA and N.R. SMITH join, dissenting from the denial of rehearing en banc:

At the crossroads between two presidents, we face a fundamental question of presidential power. President Obama created, by executive memorandum, a sweeping new immigration program that gives the benefit of "deferred action" to millions of illegal immigrants who came to the United States before the age of sixteen. Deferred action confers no formal immigration status; it is simply a commitment not to deport. Arizona, like many states, does not issue drivers' licenses to unauthorized aliens, and

therefore refuses to issue drivers' licenses to the program's beneficiaries.

Does the Supremacy Clause nevertheless force Arizona to issue drivers' licenses to the recipients of the President's largesse?  There's no doubt that Congress can preempt state law; its power to do so in the field of immigration is particularly broad.   But Congress never approved the deferred-action program:  The President adopted it on his own initiative after Congress repeatedly declined to pass the DREAM Act—legislation that would have authorized a similar program.   Undeterred, the panel claims that the President acted pursuant to authority "delegated to the executive   branch"   through   the   Immigration   and Naturalization Act (INA).  Amended op. at 36.  According to the panel, Congress gave the President the general authority to create a sprawling new program that preempts state law, even though Congress declined to create the same program.

This puzzling new preemption theory is at odds with the Supreme Court's preemption jurisprudence; it is, instead, cobbled together out of 35-year-old Equal Protection dicta. It is a theory that was rejected with bemusement by the district court, *see Ariz. Dream Act Coal.* v. *Brewer*, 945 F. Supp. 2d 1049, 1057 (D. Ariz. 2013), only to be resurrected by the panel at the eleventh hour and buried behind a 3,000-word Equal Protection detour.  It's a theory that puts us squarely at odds with the Fifth Circuit, which held recently that "the INA flatly does not permit the [executive] reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits." *Texas* v. *United States*, 809 F.3d 134, 184 (5th Cir. 2015), *aff'd by an equally divided court,* 136 S. Ct. 2271, 2272 (2016) (per curiam).  And it's a theory

that makes no mention of the foundational principle of preemption law: Historic state powers are not preempted "unless that was the clear and manifest purpose of Congress." *Arizona* v. *United States*, 132 S. Ct. 2492, 2501 (2012) (internal quotation omitted).

The opinion also buckles under the weight of its own ambiguities. The panel says repeatedly that Arizona has created "immigration classifications not found in federal law." Amended op. at 40 n.8; *see also id.* at 43, 49. But Arizona follows federal law to the letter—that is, all laws passed by Congress and signed by the President. Thus, when the panel uses the term "law," it means something quite different from what that term normally means: The panel in effect holds that the enforcement decisions of the President are federal law. Yet the lawfulness of the President's policies is an issue that the panel bends over backward not to reach. *See id.* at 44–47. I am at a loss to explain how this cake can be eaten and yet remain on the plate: The President's policies may or may not be "lawful" and may or may not be "law," but are nonetheless part of the body of "federal law" that imposes burdens and obligations on the sovereign states. While the panel suggests other reasons to doubt Arizona's response,[1] the opinion's slippery preemption theory simply

---

[1] I have little to say about the panel's lengthy Equal Protection discussion. While this Equal Protection excursus eclipses the panel's terse and enigmatic discussion of preemption, the panel is nonetheless clear that "we do not ultimately decide the Equal Protection issue." Amended op. at 29. I note, however, that there are serious doubts about the coherence of the Supreme Court's Equal Protection jurisprudence as applied to aliens. *See, e.g.*, *Korab* v. *Fink*, 797 F.3d 572, 585 (9th Cir. 2014) (Bybee, J., concurring) (describing this jurisprudence as "riddled with exceptions and caveats that make consistent judicial review of alienage classifications difficult," and suggesting an approach based solely on

isn't one of them.  *See, e.g.*, Noah Feldman, *Obama's Wobbly Legal Victory on Immigration*, Bloomberg (Apr. 6, 2016) (describing the panel's "precarious," "tricky" and "funky" reasoning that is "vulnerable to reversal by the Supreme Court").

\*          \*          \*

In the summer of 2012, the President directed his officers not to remove certain illegal immigrants who came to the United States before age sixteen.  The program, Deferred Action for Childhood Arrivals (DACA), did not clear any of the normal administrative-law hurdles; the memorandum announcing the program states that it "confers no substantive right, immigration status or pathway to citizenship" because "[o]nly the Congress, acting through its legislative authority, can confer these rights."  DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012.

Arizona responded with an executive order of its own, stating, in apparent agreement with the DACA memorandum, that the new federal program "does not and cannot confer lawful or authorized status or presence upon the unlawful alien applicants."  Ariz. Exec. Order 2012-06.  Because Arizona law requires that applicants for a driver's license submit proof that their presence is "authorized under federal law," Ariz. Rev. Stat. § 28-3153(D)—and DACA "confers no substantive right [or] immigration status"—Arizona felt justified withholding licenses from illegal immigrants who happen to be DACA beneficiaries.     Several DACA

preemption).

beneficiaries then sued Arizona, claiming, among other things, that the state's policy was preempted.

The panel agrees, holding that Arizona's policy "strayed into an exclusive domain that Congress, *through the INA*, delegated to the executive branch." Amended op. at 36 (emphasis added); *see also id.* at 28. One might think that the panel would present especially strong evidence of congressional delegation, such as an express statement to that effect. After all, it's rare enough to find that Congress has kept an entire field to itself, much less ceded one to the executive. And the bar that preemption must clear is both well-established and high: The historic police powers of states are not preempted "unless that was the clear and manifest purpose of Congress." *E.g.*, *Arizona*, 132 S. Ct. at 2501; *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009); *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485 (1996); *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The panel doesn't bother showing that Congress evinced a "clear and manifest purpose" before forcing the states to accept immigration classifications invented entirely by the President. Indeed, the panel's preemption analysis mentions only two small provisions of the INA, and this thin statutory evidence cannot possibly carry the heavy burden of field preemption.[2] The panel first notes that the INA refers to an alien's "period of stay *authorized* by the Attorney General,"

---

[2] The panel's only other analysis of the INA, in its non-precedential Equal Protection discussion, makes the rather unremarkable point that the executive branch has responsibility for executing the INA. *See* amended op. at 25–28. This does not in any way help establish whether Congress intended the INA to let the executive branch preempt the states.

beyond which the alien is "deemed to be *unlawfully present in the United States*." Amended op. at 41–42 (quoting 8 U.S.C. § 1182(a)(9)(B)(ii)). But the panel has now corrected its opinion to explain that this provision actually contemplates the executive's ability to "authorize" a period of stay only for a tiny subset of aliens—those "previously removed"—and not, as its original opinion suggested, every class of immigrant covered by the statute.[3]

The panel's second claim is that the REAL ID Act identifies deferred-action immigrants "as being present in the United States during a 'period of authorized stay,' for the purpose of issuing state identification cards." Amended op. at 42 (citation omitted). This narrow provision also can't be authority for the proposition that the INA "delegated to the executive branch" the wholesale authority to preempt state law by declaring immigrants legal when they are not. Nor does this narrow provision conflict with Arizona's policy: The provision actually says that a state "may *only* issue a temporary driver's license or temporary identification card" to deferred-action immigrants—a limit, not a requirement. REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(C)(i) (emphasis added).

---

[3] *Compare Ariz. Dream Act Coal.* v. *Brewer*, 818 F.3d 901, 916 (9th Cir. 2016) *with* amended op. at 41–42 (adding "at least for purposes of § 1182(a)(9)(B)"). As the string of letters and numbers might suggest, § 1182(a)(9)(B) is not a large portion of the INA. This subsection also offers no support for a second reason: Even if it were true that an immigrant was "unlawfully present" if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be "lawfully present" if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.

Nevertheless, the panel insists that this evidence "directly undermines" Arizona's response to DACA. Amended op. at 41. That the panel can trawl the great depths of the INA—one of our largest and most complex statutes—and return with this meager catch suggests exactly the opposite conclusion: The INA evinces a "clear and manifest" intention *not* to cede this field to the executive. This is precisely the conclusion that the Fifth Circuit reached in *Texas* v. *United States*. Our sister circuit held that even if the President's policies were of the type to which *Chevron* deference was owed—which the circuit assumed only for the sake of argument—such deference would be unavailable because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *See Texas*, 809 F.3d at 179. In other words, the INA has spoken directly to the issue and "flatly does not permit" executive supplementation like the DACA program. *Id.* at 184. If what the panel relies on evinces a "clear and manifest purpose" to cede a field to the executive, it's hard to imagine what statute doesn't.[4]

*          *          *

Perhaps daunted by the lack of support in the statute it purports to interpret, the panel turns to Supreme Court precedent, but it doesn't fare much better here. The primary case on which the panel relies, *Plyler* v. *Doe*, might contain some impressive-sounding dicta—"The States enjoy no

---

[4] And even if it were undeniably the case that Congress delegated the power of preemption to the President, I am skeptical that such a statute would be constitutional. The nondelegation doctrine is still waiting in the wings. *See generally Whitman* v. *Am. Trucking Assocs.*, 531 U.S. 457 (2001).

power with respect to the classification of aliens," 457 U.S. 202, 225 (1982)—but the reasons to reject this dicta are more impressive still.  As the district court put it when it rebuffed the *Plyler* theory of preemption:  "*Plyler* is not a preemption case."  945 F. Supp. 2d at 1057.  Justice Brennan's 1982 majority opinion—a 5–4 opinion that garnered three individual concurrences and has been questioned continuously since publication—never once mentions preemption.  *See* 457 U.S. at 205–30.**[5]**

The panel's search for support in the Supreme Court's actual preemption jurisprudence is equally misguided.  The panel quotes *De Canas* v. *Bica* for the proposition that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."  Amended op. at 34 (quoting 424 U.S. 351, 354 (1976)).  But the panel overlooks the very next sentence of *De Canas*, which notes that "the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted."  424 U.S. at 355.  So what's "a regulation of immigration" that would be preempted?  The *De Canas* opinion tells us a couple of sentences later:  It's "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id.*  Denying a driver's license is not tantamount to denying admission to the country.**[6]**  Like the

---

**[5]** The case was also wrong ab initio and is due to be reconsidered.  *See, e.g.*, Eugene Volokh, *Why Justices May Overrule 'Plyler' on Illegal Aliens*, L.A. Daily J., Nov. 28, 1994, at 6 (describing objections to *Plyler* and reasons why it may be overruled).

**[6]** The more recent cases cited by the panel—*Lozano* v. *City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), *Villas at Parkside Partners* v. *City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013), and *United States* v.

state law upheld in *De Canas*—which prevented California businesses from hiring illegal immigrants—Arizona's control over its drivers' licenses is well "within the mainstream of [the state's] police power." *Id.* at 356.

Indeed, it's difficult to imagine a preemption case less helpful to the panel than *De Canas*. The *De Canas* majority states explicitly that it will "not presume that Congress, in enacting the INA, intended to oust state authority to regulate . . . in a manner consistent with pertinent federal laws." *Id.* at 357. That uncontroversial proposition simply raises once more the question the panel works hard to avoid: If Arizona relies on the categories drawn by the INA, but not those of the executive branch, why isn't it operating consistently with "pertinent federal laws"? The panel never says.

*          *          *

Instead, we're left with the enigmatic holding we started with: Arizona "impermissibly strayed into an exclusive domain that Congress, through the INA, delegated to the executive branch." Amended op. at 36. This conclusion finds no support in the actual text of the INA. It receives no help from the Court's preemption jurisprudence. And it is a brazen renegotiation of our federal bargain. If states must accept the complete policy classifications of the INA and also every immigration decision made by the President, then

---

*Alabama*, 691 F.3d 1269 (11th Cir. 2012)—are easily distinguishable for this reason. They involved what the courts held to be an actual regulation of immigration—that is, "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355.

we've just found ourselves in a world where the President really can preempt state laws with the stroke of a pen.

The Constitution gives us a balance where federal laws "shall be the supreme law of the land," but powers not delegated to the federal government "are reserved to the states." U.S. Const., art. VI cl. 2; *id.* amend. X.  The political branches of the federal government must act together to overcome state laws.  Unison gives us clarity about what federal law consists of and when state law is subordinated. The vast power to set aside the laws of the sovereign states cannot be exercised by the President acting alone, with his power at its "lowest ebb." *Cf. Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).[7]

Presidential power can turn on and off like a spigot; what our outgoing President has done may be undone by our incoming President acting on his own.  The judiciary might find itself, after years of litigation over a President's policy, faced with a change in administration and a case on the verge of mootness.[8]  And our precedent may long outlive the DACA program:  We may soon find ourselves with new conflicts between the President and the states.  *See, e.g.*,

---

[7] We are not in the "zone of twilight," *Youngstown*, 343 U.S. at 637, where the distribution of presidential and congressional power is uncertain.  Congress has repeatedly declined to act—refusing time and time again to pass the DREAM Act—so the President is flying solo.

[8] Mootness concerns aren't theoretical.  In *Texas* v. *United States*—the direct challenge to the Obama Administration's immigration policies over which the Supreme Court split 4–4—the parties filed a joint motion to stay the merits proceedings until one month after the presidential inauguration. *See* Joint Motion to Stay, No. 1:14-cv-00254, Doc. 430 (Nov. 18, 2016).

*California and Trump Are on a Collision Course Over Immigrants Here Illegally*, L.A. Times, Nov. 11, 2016; *Cities Vow to Fight Trump on Immigration, Even if They Lose Millions*, N.Y. Times, Nov. 27, 2016.

These looming conflicts should serve as a stark reminder: Executive power favors the party, or perhaps simply the person, who wields it.  That power is the forbidden fruit of our politics, irresistible to those who possess it and reviled by those who don't. Clear and stable structural rules are the bulwark against that power, which shifts with the sudden vagaries of our politics.  In its haste to find a doctrine that can protect the policies of the present, our circuit should remember the old warning:  May all your dreams come true.

---

**OPINION**

PREGERSON, Senior Circuit Judge:

Plaintiffs are five individual recipients of deferred action under the Deferred Action for Childhood Arrivals ("DACA") program, and the Arizona DREAM Act Coalition ("ADAC"), an organization that advances the interests of young immigrants.  DACA recipients are noncitizens who were brought to this country as children.   Under the DACA program, they are permitted to remain in the United States for some period of time as long as they meet certain conditions. Authorized by federal executive order, the DACA program is administered by the Department of Homeland Security and is consistent with the Supreme Court's ruling that the federal government "has broad, undoubted power over the subject of

immigration and the status of aliens" under the Constitution. *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012).

In response to the creation of the DACA program, Defendants—the Governor of the State of Arizona; the Arizona Department of Transportation ("ADOT") Director; and the Assistant Director of the Motor Vehicle Division—instituted a policy that rejected the Employment Authorization Documents ("EADs") issued to DACA recipients under the DACA program as proof of authorized presence for the purpose of obtaining a driver's license. Plaintiffs seek permanently to enjoin Defendants from categorically denying drivers' licenses to DACA recipients. The district court ruled that Arizona's policy was not rationally related to a legitimate government purpose and thus violated the Equal Protection Clause of the Fourteenth Amendment. The district court granted Plaintiffs' motion for summary judgment and entered a permanent injunction. Defendants appealed.

We agree with the district court that DACA recipients are similarly situated to other groups of noncitizens Arizona deems eligible for drivers' licenses. As a result, Arizona's disparate treatment of DACA recipients may well violate the Equal Protection Clause, as our previous opinion indicated is likely the case. *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014). The district court relied on this ground when it issued the permanent injunction. Applying the principle of constitutional avoidance, however, we need not and should not come to rest on the Equal Protection issue, even if it "is a plausible, and quite possibly meritorious" claim for Plaintiffs, so long as there is a viable alternate, nonconstitutional ground to reach the same result. *Overstreet v. United Bhd. of Carpenters & Joiners of Am.,*

*Local Union No. 1506*, 409 F.3d 1199, 1211 (9th Cir. 2005) (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 576–78 (1988)).

We conclude that there is. Arizona's policy classifies noncitizens based on Arizona's independent definition of "authorized presence," classification authority denied the states under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*. We therefore affirm the district court's order granting summary judgment and entry of a permanent injunction, on the basis that Arizona's policy is preempted by the exclusive authority of the federal government to classify noncitizens. *See Weiser v. United States*, 959 F.2d 146, 147 (9th Cir. 1992) ("[This court] can affirm the district court on any grounds supported by the record.").

## FACTUAL BACKGROUND

### I.  The DACA Program

On June 15, 2012, the Department of Homeland Security announced the DACA program pursuant to the DACA Memorandum. Under the DACA program, the Department of Homeland Security exercises its prosecutorial discretion not to seek removal of certain young immigrants. The DACA program allows these young immigrants, including members of ADAC, to remain in the United States for some period of time as long as they meet specified conditions.

To qualify for the DACA program, immigrants must have come to the United States before the age of sixteen and must have been under the age of thirty-one by June 15, 2012. *See* Memorandum from Secretary Janet Napolitano, Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). They must have been living in the United States at the time the DACA program was announced and must have continuously resided here for at least the previous five years. *Id.* Additionally, DACA-eligible immigrants must be enrolled in school, have graduated from high school, have obtained a General Educational Development certification, or have been honorably discharged from the U.S. Armed Forces or Coast Guard. *Id.* They must not pose a threat to public safety and must undergo extensive criminal background checks. *Id.*

If granted deferred action under DACA, immigrants may remain in the United States for renewable two-year periods. DACA recipients enjoy no formal immigration status, but the Department of Homeland Security does not consider them to be unlawfully present in the United States and allows them to receive federal EADs.

## II. Arizona's Executive Order

On August 15, 2012, the Governor of Arizona issued Arizona Executive Order 2012-06 ("Arizona Executive Order"). Executive Order 2012-06, "Re-Affirming Intent of Arizona Law In Response to the Federal Government's Deferred Action Program" (Aug. 15, 2012). A clear response to DACA, the Arizona Executive Order states that "the Deferred Action program does not and cannot confer lawful or authorized status or presence upon the unlawful alien applicants." *Id.* at 1. The Arizona Executive Order announced that "[t]he issuance of Deferred Action or Deferred Action USCIS employment authorization documents to unlawfully present aliens does not confer upon them any lawful or authorized status and does not entitle them

to any additional public benefit." *Id.* The Order directed Arizona state agencies, including ADOT, to "initiate operational, policy, rule and statutory changes necessary to prevent Deferred Action recipients from obtaining eligibility, beyond those available to any person regardless of lawful status, for any taxpayer-funded public benefits and state identification, including a driver's license." *Id.*

## III.     Arizona's Driver's License Policy

To implement the Arizona Executive Order, officials at ADOT and its Motor Vehicle Division initiated changes to Arizona's policy for issuing drivers' licenses. Under Arizona state law, applicants can receive a driver's license only if they can "submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28-3153(D). Prior to the Arizona Executive Order, ADOT Policy 16.1.2 included all federally issued EADs as "proof satisfactory" that an applicant's presence was "authorized under federal law." The Motor Vehicle Division therefore issued drivers' licenses to all individuals with such documentation.

After the Arizona Executive Order, the Motor Vehicle Division announced that it would not accept EADs issued to DACA recipients—coded by the Department of Homeland Security as (c)(33)—as proof that their presence in the United States is "authorized under federal law." The Motor Vehicle Division continued to accept federally issued EADs from all other noncitizens as proof of their lawful presence, including individuals who received deferred action outside of the DACA program and applicants coded (c)(9) (individuals who have applied for adjustment of status), and (c)(10) (individuals who have applied for cancellation of removal).

In 2013, ADOT revised its policy again. Explaining this change, ADOT Director John S. Halikowski testified that Arizona views an EAD as proof of presence authorized under federal law only if the EAD demonstrates: (1) the applicant has formal immigration status; (2) the applicant is on a path to obtaining formal immigration status; or (3) the relief sought or obtained is expressly provided pursuant to the INA. Using these criteria, ADOT began to refuse driver's license applications that relied on EADs, not only from DACA recipients, but also from beneficiaries of general deferred action and deferred enforced departure. It continued to accept as proof of authorized presence for purposes of obtaining drivers' licenses EADs from applicants with (c)(9) and (c)(10) status. We refer to the policy that refuses EADs from DACA recipients as "Arizona's policy."

## IV.     Preliminary Injunction

On November 29, 2012, Plaintiffs sued Defendants in federal district court, alleging that Arizona's policy of denying drivers' licenses to DACA recipients violates the Equal Protection Clause and the Supremacy Clause of the U.S. Constitution. Plaintiffs sought declaratory relief and a preliminary injunction prohibiting Defendants from enforcing their policy against DACA recipients. On May 16, 2013, the district court ruled that Arizona's policy likely violated the Equal Protection Clause but it declined to grant the preliminary injunction because Plaintiffs had not shown irreparable harm. *ADAC v. Brewer*, 945 F. Supp. 2d 1049 (D. Ariz. 2013) ("*ADAC I*"), *reversed by ADAC v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ("*ADAC II*"). It also granted Defendants' motion to dismiss the Supremacy Clause claim. *Id.* at 1077–78. Plaintiffs appealed the district court's denial of a preliminary injunction.

## V.  Permanent Injunction

While Plaintiffs' appeal of the preliminary injunction ruling was pending, Plaintiffs sought a permanent injunction in district court on Equal Protection grounds and moved for summary judgment.  Defendants also moved for summary judgment, arguing that DACA recipients are not similarly situated to other noncitizens who are eligible for drivers' licenses under Arizona's policy.

We reversed the district court's decision on the motion for preliminary injunction, agreeing with the district court that Arizona's policy likely violated the Equal Protection Clause and holding that Plaintiffs had established that they would suffer irreparable harm as a result of its enforcement.  *See ADAC II*, 757 F.3d at 1064.  In a concurring opinion, one member of our panel concluded that Plaintiffs also demonstrated a likelihood of success on their claim that Arizona's policy was preempted.  *Id.* at 1069 (Christen, J., concurring).  On January 22, 2015, the district court granted Plaintiffs' motion for summary judgment and entered a permanent injunction.  *ADAC v. Brewer*, 81 F. Supp. 3d 795 (D. Ariz. 2015) ("*ADAC III*").  We affirm the district court's order.

## STANDARD OF REVIEW

We review the district court's grant or denial of motions for summary judgment *de novo*.  *Besinga v. United States*, 14 F.3d 1356, 1359 (9th Cir. 1994).  We determine whether there are any genuine issues of material fact and review the district court's application of substantive law.  *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011).  We "may affirm a grant of summary judgment on any ground

supported by the record." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014).

We review the district court's decision to grant a permanent injunction for abuse of discretion. *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (citing *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002)). We review questions of law underlying the district court's decision *de novo*. *See Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). "If the district court 'identified and applied the correct legal rule to the relief requested,' we will reverse only if the court's decision 'resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

## DISCUSSION

## I. Equal Protection

### A. Similarly Situated

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To prevail on an Equal Protection claim, plaintiffs must show "that a class that is similarly situated has been treated disparately." *Christian*

*Gospel Church, Inc. v. City & Cty. of S.F.*, 896 F.2d 1221, 1225 (9th Cir. 1990), *superseded on other grounds by* 42 U.S.C. § 2000e.

"The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). In this instance, DACA recipients do not need to be similar in all respects to other noncitizens who are eligible for drivers' licenses, but they must be similar in those respects that are relevant to Arizona's own interests and its policy. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." (emphasis added)).

We previously held that DACA recipients and other categories of noncitizens who may rely on EADs are similarly situated with regard to their right to obtain drivers' licenses in Arizona. *See ADAC II*, 757 F.3d at 1064. The material facts and controlling authority remain the same from the preliminary injunction stage. Thus, we again hold that in all relevant respects DACA recipients are similarly situated to noncitizens eligible for drivers' licenses under Arizona's policy. Nonetheless, for clarity and completeness, we address once more Defendants' arguments.

Defendants assert that DACA recipients are not similarly situated to other noncitizens eligible for drivers' licenses under Arizona's policy because DACA recipients neither

received nor applied for relief provided by the INA, or any other relief authorized by federal statute. Particularly relevant here, Defendants note that eligible noncitizens under the categories of (c)(9) and (c)(10) are tied to relief expressly found in the INA: adjustment of status (INA § 245; 8 U.S.C. § 1255; 8 C.F.R. § 274a.12(c)(9)) and cancellation of removal (INA § 240A; 8 U.S.C. § 1229b; 8 C.F.R. § 274a.12(c)(10)), respectively. In contrast, Defendants contend that DACA recipients' presence in the United States does not have a connection to federal law but rather reflects the Executive's discretionary decision not to enforce the INA.

We continue to disagree. *See ADAC II*, 757 F.3d at 1061. As explained below, Arizona has no cognizable interest in making the distinction it has for drivers' licenses purposes. The federal government, not the states, holds exclusive authority concerning direct matters of immigration law. *DeCanas v. Bica*, 424 U.S. 351, 354 (1976), *superseded by statute on other grounds as recognized in Arizona*, 132 S. Ct. at 2503–04. The states therefore may not make immigration decisions that the federal government, itself, has not made, *Plyler*, 457 U.S. at 225 (citing *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Arizona's encroachment into immigration affairs—making distinctions between groups of immigrants it deems not to be similarly situated, despite the federal government's decision to treat them similarly—therefore seems to exceed its authority to decide which aliens are similarly situated to others for Equal Protection purposes. In other words, the "similarly situated" analysis must focus on factors of similarity and distinction pertinent to the state's policy, not factors outside the realm of its authority and concern.

Putting aside that limitation, the INA explicitly authorizes the Secretary of Homeland Security to administer and enforce all laws relating to immigration and naturalization. INA § 103(a)(1); 8 U.S.C. § 1103(a)(1). As part of this authority, it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States.

The INA expressly provides for deferred action as a form of relief that can be granted at the Executive's discretion. For example, INA § 237(d)(2); 8 U.S.C. § 1227(d)(2), allows a noncitizen who has been denied an administrative stay of removal to apply for deferred action. Certain individuals are also "eligible for deferred action" under the INA if they qualify under a set of factors. *See* INA § 204(a)(1)(D)(i)(II); 8 U.S.C. § 1154(a)(1)(D)(i)(II). Deferred action is available to individuals who can make a showing of "exceptional circumstances." INA § 240(e); 8 U.S.C. § 1229a(e). By necessity, the federal statutory and regulatory scheme, as well as federal case law, vest the Executive with very broad discretion to determine enforcement priorities.[1]

---

[1] Pursuant to this discretion, the Department of Homeland Security and its predecessor, the Immigration and Naturalization Service ("INS"), established a series of general categorical criteria to guide enforcement. For example, the 1978 INS Operating Instructions outlined five criteria for officers to consider in exercising prosecutorial discretion, including "advanced or tender age." O.I. 103.1(a)(1)(ii); *see also Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir. 1983). Discretion can also cut the other way. For example, the 2011 Morton Memo highlighted "whether the person poses national security or public safety concern," Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (June 17, 2011), and

Congress expressly charged the Department of Homeland Security with the responsibility of "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The Department of Homeland Security regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14). Additionally, the Supreme Court has made it clear that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The Supreme Court has explained that the Secretary has discretion to exercise deferred action at each stage of the deportation process, and has acknowledged the long history of the Executive "engaging in a regular practice . . . of exercising that discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999); *see also id.* n.8; *Arizona*, 132 S. Ct. at 2499 (noting that "[a] principal feature of the removal system is the broad discretion exercised by" the Executive); *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) (noting the State of Texas's concession that the INA "places no substantive limits on the

_____

the 2014 Johnson Memo identifies the "highest [enforcement] priority" as noncitizens who might represent a threat to "national security, border security, and public safety," Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, on "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (November 20, 2014).

Attorney General and commits enforcement of the INA to her discretion").[2]

Defendants' argument fails because they attempt to distinguish categories of EAD-holders in a way that does not amount to any relevant difference. Like adjustment of status, (c)(9), and cancellation of removal, (c)(10), deferred action is a form of relief grounded in the INA. Moreover, the exercise of prosecutorial discretion in deferred action flows from the authority conferred on the Secretary by the INA.

Defendants provide two criteria to explain when they deem an EAD satisfactory proof of authorized presence: the applicant has formal immigration status, or the applicant is on the path to formal immigration status. Neither criteria suffices to render DACA recipients not similarly situated to

---

[2] In the past, the Department of Homeland Security and the INS have granted deferred action to different groups of noncitizens present in the United States. In 1977, the Attorney General granted stays of removal to 250,000 nationals of certain countries (known as "Silva Letterholders"). *Silva v. Levi*, No. 76-C4268 (N.D. Ill. 1977), *modified on other grounds sub nom. Silva v. Bell*, 605 F.2d 978 (7th Cir.1979). In 1990, the INS instituted the "Family Fairness" program that deferred the deportation of 1.5 million family members of noncitizens who were legalized through the Immigration Reform and Control Act. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, "Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens" (Feb. 2, 1990). In 1992, President Bush directed the Attorney General to grant deferred enforced departure to 190,000 Salvadorans. *See* Immigration Act of 1990 § 303, Public Law 101-649 (Nov. 29, 1990); https://www.gpo.gov/fdsys/pkg/FR-1994-12-06/html/94-30088.htm. And nationals of Liberia were granted deferred enforced departure until September 30, 2016, http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/deferred-enforced-departure.

other EAD-holders on any basis pertinent to Arizona's decision whether to grant them drivers' licenses. Like DACA recipients, many noncitizens who apply for adjustment of status and cancellation of removal—including individuals with (c)(9) and (c)(10) EADs—do not, and may never, possess formal immigration status. *See Guevara v. Holder*, 649 F.3d 1086, 1095 (9th Cir. 2011).

Additionally, "submission of an application does not connote that the alien's immigration status has changed." Thus, merely applying for immigration relief does not signal a clear path to formal immigration status. *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011) (quoting *United States v. Elrawy*, 448 F.3d 309, 313 (5th Cir. 2006)). Indeed, given how frequently these applications are denied, "the supposed 'path' may lead to a dead end." *ADAC II*, 757 F.3d at 1065. In this regard, noncitizens holding (c)(9) and (c)(10) EADs are no different from DACA recipients. And as discussed above, DACA recipients have a temporary reprieve—deferred action—that is provided for by the INA, pursuant to the prosecutorial discretion statutorily delegated to the Executive.

Therefore, in all relevant respects, DACA recipients are similarly situated to other categories of noncitizens who may rely on EADs to obtain drivers' licenses under Arizona's policy.

## B. State Interest

The next step in an Equal Protection analysis is to determine the applicable level of scrutiny. *Country Classic Dairies*, 847 F.2d at 596. Although we do not ultimately decide the Equal Protection issue, we remain of the view,

articulated in our preliminary injunction opinion, that Arizona's policy may well fail even rational basis review. So, as before, we need not reach what standard of scrutiny applies.**[3]** *See ADAC II*, 757 F.3d at 1065.

Arizona's policy must be "rationally related to a legitimate state interest" to withstand rational basis review. *City of Cleburne*, 473 U.S. at 440. On appeal, Defendants advance six rationales for Arizona's policy, none of which persuade us that Plaintiffs' argument under the Equal Protection Clause is not at least sufficiently strong to trigger the constitutional avoidance doctrine we ultimately invoke.

First, Defendants argue that Arizona's policy is rationally related to the State's concern that it could face liability for improperly issuing drivers' licenses to DACA recipients. But as the district court observed, the depositions of ADOT Director John S. Halikowski and Assistant Director of the Motor Vehicle Division Stacey K. Stanton did not yield support for this rationale. Neither witness was able to identify any instances in which the state faced liability for issuing licenses to noncitizens not authorized to be present in the country. *ADAC III*, 81 F. Supp. 3d at 807. So the record probably does not establish that there is a rational basis for this concern.

---

**[3]** In cases involving alleged discrimination against noncitizens authorized to be present in the United States, the Supreme Court has consistently applied strict scrutiny to the state action at issue. *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *Graham v. Richardson*, 403 U.S. 365, 372 (1971). Where the alleged discrimination targets noncitizens who are not authorized to be present, the Supreme Court applies rational basis review. *See Plyler*, 457 U.S. at 223–24.

Second, Defendants contend that Arizona's policy serves the State's interest in preventing DACA recipients from making false claims for public assistance. As the district court noted, however, Director Halikowski and Assistant Director Stanton testified that they had no basis for believing that drivers' licenses could be used to access state and federal benefits. It follows that this concern is probably not a rational basis justifying Arizona's policy either. *Id.* (citing *ADAC II*, 757 F.3d at 1066).

Third, Defendants claim that Arizona's policy is meant to reduce the administrative burden of issuing drivers' licenses to DACA recipients, only to have to revoke them once the DACA program is terminated. The district court found this argument lacked merit, noting this court's observation that it is less likely that Arizona will need to revoke the licenses of DACA recipients than of noncitizens holding (c)(9) and (c)(10) EADs, because applications for adjustment of status or cancellation of removal are routinely denied.[4] *ADAC III*, 81 F. Supp. 3d at 807 (citing *ADAC II*, 757 F.3d at 1066–67). Indeed, noncitizens with (c)(10) EADs are already in removal proceedings, which means they are further along in the deportation process than are many DACA recipients. The administrative burden of issuing and revoking drivers' licenses for DACA recipients is not greater than the burden of issuing and revoking drivers' licenses for noncitizens holding (c)(9) and (c)(10) EADs. Certainly, the likelihood of having to do so does not distinguish these two classes of

---

[4] Defendants suggest "later-developed facts" indicate that noncitizens holding (c)(9) and (c)(10) EADs are on the path to permanent residency. We are not convinced that *achieving* certain forms of relief (adjustment of status or cancellation of removal) alters the fact that applications for such relief are regularly denied in very great numbers.

noncitizens, as (c)(9) and (c)(10) applications for relief are frequently denied.

Fourth, Defendants argue that Arizona has an interest in avoiding financial harm to individuals who may be injured in traffic accidents by DACA recipients. Defendants contend that individuals harmed by DACA recipients may be left without recourse when the DACA program is terminated and DACA recipients are removed from the country. But this rationale applies equally to individuals with (c)(9) and (c)(10) EADs. These noncitizens may find their applications for immigration relief denied and may be quickly removed from the country, leaving those injured in traffic accidents exposed to financial harm. Nevertheless, Arizona issues drivers' licenses to noncitizens holding (c)(9) and (c)(10) EADs.

Fifth, Defendants contend that denying licenses to DACA recipients serves the goal of consistently applying ADOT policy. But ADOT *in*consistently applies its own policy by denying licenses to DACA recipients while providing licenses to holders of (c)(9) and (c)(10) EADs. Arizona simply has no way to know what "path" noncitizens in any of these categories will eventually take. DACA recipients appear similar to individuals who are eligible under Arizona's policy with respect to all the criteria ADOT relies on. ADOT thus applies its own immigration classification with an uneven hand by denying licenses only to DACA recipients. *See, e.g.*, *Yick Wo. v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("[I]f [the law] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

Sixth, Defendants claim that Arizona's policy is rationally related to ADOT's statutory obligation to administer the state's driver's license statute. ADOT's disparate treatment of DACA recipients pursuant to the driver's license statute relies on the premise that federal law does not authorize DACA recipients' presence in the United States. This rationale is essentially an assertion of the state's authority to decide whether immigrants' presence is authorized under federal law. Rather than evaluating that assertion as part of the Equal Protection analysis, we defer doing so until our discussion of our ultimate, preemption ground for decision, which we adopt as part of our constitutional avoidance approach.

Before proceeding to that discussion, it bears noting, once again, *see ADAC II*, 757 F.3d at 1067, that the record *does* suggest an additional reason for Arizona's policy: a dogged animus against DACA recipients. The Supreme Court has made very clear that such animus cannot constitute a legitimate state interest, and has cautioned against sowing the seeds of prejudice. *See Romer v. Evans*, 517 U.S. 620, 634 (1996); *see also City of Cleburne*, 473 U.S. at 464 (Marshall, J., concurring in the judgment in part, and dissenting in part) ("Prejudice, once let loose, is not easily cabined."). "The Constitution's guarantee of equality must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2681 (2013) (citation omitted).

## II. Preemption

We do not "decide federal constitutional questions where a dispositive nonconstitutional ground is available." *City of*

*L.A. v. Cty. of Kern*, 581 F.3d 841, 846 (9th Cir. 2009) (quoting *Correa v. Clayton*, 563 F. 2d 396, 400 (9th Cir. 1977)).    While preemption derives its force from the Supreme Clause of the Constitution, "it is treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Prods.*, 431 U.S. 265, 271–72 (1977).[5]   Given the formidable Equal Protection concerns Arizona's policy raises, we turn to a preemption analysis as an alternative to resting our decision on the Equal Protection Clause.[6]   Doing so, we conclude that Arizona's policy encroaches on the exclusive federal authority to create immigration classifications and so is displaced by the INA.

The "[p]ower to regulate immigration is unquestionably exclusively a federal power." *DeCanas*, 424 U.S. at 354.

---

[5] Though preemption principles are rooted in the Supremacy Clause, this court has previously applied the principle that preemption does not implicate a constitutional question for purposes of constitutional avoidance. *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir. 1993) (holding that *Pullman* abstention was not warranted for preemption claims because "preemption is not a constitutional issue."); *Knudsen Corp. v. Nev. State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir. 1982) (same).

[6] In their opening brief, Defendants argue preemption is not properly before this court because Plaintiffs did not appeal the district court's dismissal of their preemption claim.   But at oral argument, defense counsel offered to provide supplemental briefing on the issue.   Separately, Plaintiffs noted that Defendants raised the Take Care argument for the first time on appeal and argued it ought not be considered because it was not presented to the district court.   Following oral argument, we requested and the parties submitted supplemental briefing on both issues.   Defendants' supplemental brief conceded that, in light of the considerations articulated in *Olympia Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006), we may properly consider preemption in this case.

The Supreme Court's immigration jurisprudence recognizes that the occupation of a regulatory field may be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Supreme Court has also indicated that the INA provides a pervasive framework with regard to the admission, removal, and presence of aliens. *See Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (quoting *DeCanas*, 424 U.S. at 353, 359); *cf. Arizona*, 132 S. Ct. at 2499 ("Federal governance of immigration and alien status is extensive and complex.").

Traditionally, federal law preempts state law when: (1) Congress expressly includes a preemption provision in federal law; (2) states attempt to "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance"; or (3) state law conflicts with federal law, either because "compliance with both federal and state regulations is a physical impossibility" or "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963), and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

"The States enjoy no power with respect to the classification of aliens." *Plyler v. Doe*, 457 U.S. 202, 225 (1982). The Supreme Court has also expressly recognized that the source of preemption in the immigration context is unique. The "[f]ederal authority to regulate the status of aliens derives" not from one specific federal law or network

of laws, but "from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,'. . . its power '[t]o regulate Commerce with foreign Nations,' and its broad authority over foreign affairs . . . ." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). Supreme Court precedent explains that "neither a clear encroachment on exclusive federal power to admit aliens nor a clear conflict with a specific congressional purpose" is required in order for federal law to preempt state regulations of immigrants. *See id.* at 11 n.16 (internal quotation marks omitted). "Not surprisingly, . . . [Supreme Court] cases have also been at pains to note the substantial limitations upon the authority of the States in making classifications based upon alienage." *Id.* at 10.

To be sure, not all state regulations touching on immigration are preempted. *See Chamber of Commerce*, 131 S. Ct. at 1974. But states may not directly regulate immigration, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013), and the power to classify aliens for immigration purposes is "committed to the political branches of the Federal Government." *Plyler*, 457 U.S. at 225 (quoting *Mathews*, 426 U.S. at 81). Arizona prohibits the issuance of drivers' licenses to anyone who does not submit proof that his or her presence in the United States is "authorized under federal law," Ariz. Rev. Stat. § 28-3153(D), and then purports to create its own independent definition of "authorized under federal law," one that excludes DACA beneficiaries. Because Arizona created a new immigration classification when it adopted its policy regarding driver's license eligibility, it impermissibly strayed into an exclusive domain that Congress, through the INA, delegated to the executive branch.

States can regulate areas of traditional state concern that might impact noncitizens.  *See DeCanas*, 424 U.S. at 355. Permissible state regulations include those that mirror federal objectives and incorporate federal immigration classifications.  *Plyler*, 457 U.S. at 225–26.  But a law that regulates an area of traditional state concern can still effect an impermissible regulation of immigration.

For example, in *Takahashi v. Fish & Game Commission*, the Supreme Court observed that a state regulation of entitlement to commercial fishing licenses based on immigration classifications conflicted with the "constitutionally derived federal power to regulate immigration."  334 U.S. 410, 419 (1948).  In *Toll v. Moreno*, the Supreme Court held that preemption principles foreclosed a state policy concerning the imposition of tuition charges and fees at a state university on the basis of immigration status.  458 U.S. 1, 16–17 (1982).  Similarly, the Third Circuit has held that municipal ordinances preventing unauthorized aliens from renting housing constituted an impermissible regulation of immigration and were preempted by the INA.  *Lozano v. City of Hazleton*, 724 F.3d 297, 317 (3d Cir. 2013).  Although the housing ordinances did not directly regulate immigration in the sense of dictating who could or could not be admitted into the United States, the Third Circuit concluded that they impermissibly "intrude[d] on the regulation of residency *and presence* of aliens in the United States."  *Id.* (emphasis added).

Similarly, the Fifth Circuit held that an ordinance "allow[ing] state courts to assess the legality of a non-citizen's presence" in the United States was preempted because it "open[ed] the door to conflicting state and federal rulings on the question."  *Villas at Parkside Partners v. City*

*of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013).  The Fifth Circuit's decision was based on its recognition that "[t]he federal government alone . . . has the power to classify non-citizens."  *Id.*  In accord with these decisions, the Eleventh Circuit held that a state law prohibiting courts from recognizing contracts involving unlawfully present aliens was preempted as "a thinly veiled attempt to regulate immigration under the guise of contract law."  *See United States v. Alabama*, 691 F.3d 1269, 1292–96 (11th Cir. 2012).

Cases involving the allocation of state resources on the basis of immigration classifications frequently raise both equal protection and preemption concerns.  Some decisions applying preemption principles have ultimately rested on equal protection grounds, *see, e.g.*, *Takahashi*, 334 U.S. 410.  In *Toll*, however, the Supreme Court noted commentators' observations "that many of the Court's decisions concerning alienage classifications, such as *Takahashi*, are better explained in pre-emption than in equal protection terms." 458 U.S. at 11 n.16.

Here, Arizona's policy ostensibly regulates the issuance of drivers' licenses, admittedly an area of traditional state concern.  *See Chamber of Commerce*, 131 S. Ct. at 1983.  But its policy necessarily "embodies the State's independent judgment that recipients of [DACA] are not 'authorized' to be present in the United States '*under federal law*.'"  *ADAC II*, 757 F.3d at 1069 (Christen, J., concurring).  Indeed, the Arizona Executive Order declared that "the Deferred Action program does not and cannot confer lawful or authorized . . . presence upon the unlawful alien applicants."  Executive Order 2012-06 at 1.  The Order also announced Arizona's view that "[t]he issuance of Deferred Action or Deferred Action . . . [EADs] to unlawfully present aliens does not

confer upon them any lawful *or* authorized status." *Id.* (emphasis added). To implement the Order, ADOT initiated a policy of denying licenses to DACA recipients pursuant to Arizona's driver's license statute, which requires that applicants "submit proof satisfactory to the department that the applicant's presence in the United States is *authorized under federal law*." Ariz. Rev. Stat. Ann. § 28-3153(D) (emphasis added).

Arizona points to three criteria to justify treating EAD recipients differently than individuals with (c)(9) and (c)(10) EADs,[7] even though the federal government treats their EADs the same in all relevant respects. But Arizona's three criteria—that an applicant: has formal status; is on a path to formal status; or has applied for relief expressly provided for in the INA—cannot be equated with "authorized presence" under federal law. DACA recipients and noncitizens with (c)(9) and (c)(10) EADs all lack formal immigration status, yet the federal government permits them to live and work in the country for an undefined period of time, provided they comply with certain conditions.

Arizona thus distinguishes between noncitizens based on its *own* definition of "authorized presence," one that neither mirrors nor borrows from the federal immigration classification scheme. And by arranging federal classifications in the way it prefers, Arizona impermissibly assumes the federal prerogative of creating immigration

---

[7] As we have noted, recipients of (c)(9) and (c)(10) documents are noncitizens who have applied for adjustment of status and cancellation of removal, respectively. *See* 8 C.F.R. § 274a.12(c)(9)–(10).

classifications according to its own design,[8] thereby engaging in an "exercise of regulatory bricolage," *ADAC II*, 757 F.3d at 1072 (Christen, J., concurring), despite the fact that "States enjoy no power with respect to the classification of aliens," *Plyler*, 457 U.S. at 225.

That this case involves classes of aliens the Executive has, as a matter of discretion, placed in a low priority category for removal is a further consideration weighing against the validity of Arizona's policy. The Supreme Court has emphasized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. And the Court has specifically recognized that federal statutes contemplate and protect the discretion of the Executive Branch when making determinations concerning deferred action. *See Reno*, 525 U.S. at 484–86. The discretion built into statutory removal procedures suggests that auxiliary state regulations regarding the presence of aliens in the United States are particularly intrusive on the overall federal statutory immigration scheme.

---

[8] Defendants' continual insistence that Arizona's policy is not preempted because the DACA program lacks "the force of law" reflects a misunderstanding of the preemption question. Preemption is not a gladiatorial contest that pits the DACA Memorandum against Arizona's policy. Nor does this opinion rely on the DACA Memorandum for its conclusion that Arizona's policy is preempted by federal law. Rather, Arizona's policy is preempted by the supremacy of federal authority under the INA to create immigration categories. Indeed, because Arizona's novel classification scheme includes not just DACA recipients but also recipients of regular deferred action and deferred enforced departure, our conclusion that Arizona's scheme impermissibly creates immigration classifications not found in federal law is not dependent upon the continued vitality of the DACA program.

Unable to point to any federal statute or regulation that justifies classifying individuals with (c)(9) and (c)(10) EADs as authorized to be present while excluding recipients of deferred action or deferred enforced departure, Defendants argue that Arizona properly relied on statements by the U.S. Citizenship and Immigration Service that "make clear that deferred action does not confer a lawful immigration status." These statements take the form of an email from a local U.S. Citizenship and Immigration Service Community Relations Officer in response to an inquiry from ADOT. In the email, the officer notes that DACA recipients applying for work authorization should fill in category "C33" and not category "C14," which is the category for regular deferred action.

This email does nothing to further Defendants' argument. The officer's statement in no way suggests that federal law supports Arizona's novel classifications. And even if it did, an email from a local U.S. Citizenship and Immigration Services Officer is not a source of "federal law," nor an official statement of the government's position.[9]

The INA, indeed, directly undermines Arizona's novel classifications. For purposes of determining the admissibility of aliens other than those lawfully admitted for permanent residence, the INA states that if an alien is present in the United States beyond a "period of stay *authorized* by the Attorney General" or without being admitted or paroled, the

---

[9] In *ADAC II*, Defendants also argued that a "Frequently Asked Questions" section of the U.S. Citizenship and Immigration Services Website and a Congressional Research Service Memorandum demonstrated that Arizona's classification found support in federal law. *See* 757 F.3d at 1073. We understand Defendants to have abandoned these arguments. But even if they had not, neither source is a definitive statement of federal law.

alien is "deemed to be *unlawfully present* in the United States," at least for purposes of § 1182(a)(9)(B). INA § 212(a)(9)(B)(ii); 8 U.S.C. § 1182(a)(9)(B)(ii) (emphases added). The administrative regulations implementing this section of the INA, to which we owe deference, establish that deferred action recipients do not accrue "unlawful presence" for purposes of calculating when they may seek admission to the United States. 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2). Because such recipients are provisionally present without being admitted or paroled, their stay must be considered "authorized by the Attorney General," for purposes of this statute. INA § 212(a)(9)(B)(ii); 8 U.S.C. § 1182(a)(9)(B).

The REAL ID Act, which amended the INA, further undermines Arizona's interpretation of "authorized presence." REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231. The Real ID Act amendments provide that states may issue a driver's license or identification card to persons who can demonstrate they are "authorized [to] stay in the United States." *Id.* § 202(c)(2)(C)(i)–(ii). Persons with "approved deferred action status" are expressly identified as being present in the United States during a "period of authorized stay," for the purpose of issuing state identification cards. *Id.* § 202(c)(2)(B)(viii), (C)(ii). We point to these statutory definitions not as examples of all-encompassing congressionally authorized decisions about who may remain in the United States, but as examples of the federal government exercising its exclusive authority to classify immigrants.

Despite Arizona's clear departure from federal immigration classifications, Defendants argue Arizona's policy is not a "back-door regulation of immigration." They

compare it to the Louisiana Supreme Court policy the Fifth Circuit upheld in *LeClerc v. Webb*, which prohibited any alien lacking permanent resident status from joining the state bar. 419 F.3d 405, 410 (5th Cir. 2005). But the Louisiana Supreme Court did not create a novel immigration classification as Arizona does here. Rather, it permissibly borrowed from existing federal classifications, distinguishing "those aliens who have attained permanent resident status in the United States" from those who have not. *Id.* (quoting *In re Bourke*, 819 So. 2d 1020, 1022 (La. 2002)).

Defendants also argue that sections of the INA granting states discretion to provide public benefits to certain aliens, including deferred action recipients, suggest that Congress "has not intended to occupy a field so vast that it precludes all state regulations that touch upon immigration." *See* 8 U.S.C. §§ 1621, 1622. But we do not conclude that Congress has preempted all state regulations that touch upon immigration. Arizona's policy is preempted because, in determining which aliens shall be eligible to receive a state benefit, Arizona created new immigration classifications based on its independent view of who is authorized under federal law to be present in the United States.

Defendants offer no foundation for an interpretation of federal law that classifies individuals with (c)(9) and (c)(10) EADs as having "authorized presence," but DACA recipients as having no authorized presence. Arizona's policy of denying drivers' licenses to DACA recipients based on its own notion of "authorized presence" is preempted by the exclusive authority of the federal government under the INA to classify noncitizens.

## III.    Constitutionality of the DACA Program

We decline to rule on the constitutionality of the DACA program, as the issue is not properly before our court; only the lawfulness of Arizona's policy is in question.

We note, however, that the discussion above is quite pertinent to both of Defendants' primary arguments undergirding their challenge to the constitutionality of the DACA program. First, Defendants argue that the Executive has no power, independent of Congress, to enact the DACA program. But as we have discussed, the INA is replete with provisions that confer prosecutorial discretion on the Executive to establish its own enforcement priorities. *See supra*, section II. Third parties generally may not contest the exercise of this discretion, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including in the immigration context, *see Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).[10]

Second, Defendants contend that the DACA program amounts to a wholesale suspension of the INA's provisions, which in turn violates the President's obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3

---

[10] Congress's failure to pass the Development, Relief, and Education for Alien Minors ("DREAM") Act does not signal the illegitimacy of the DACA program. The Supreme Court has admonished that an unenacted bill is not a reliable indicator of Congressional intent. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969). Moreover, the DREAM Act and the DACA program are not interchangeable policies because they provide different forms of relief (*i.e.*, the DREAM Act would have granted conditional residency that could lead to permanent residency, whereas the DACA program offers a more limited, temporary deferral of removal).

("the Take Care Clause"). But, according to an amicus brief filed by the Department of Justice, the Department of Homeland Security only has funding annually to remove a few hundred thousand of the 11.3 million undocumented aliens living in the United States. Constrained by these limited resources, the Department of Homeland Security must make difficult decisions about whom to prioritize for removal. Despite Defendants' protestations, they have not shown that the Department of Homeland Security failed to comply with its responsibilities to the extent its resources permit it to do so.[11]

For that reason, this case is nothing like *Train v. City of New York*, a case relied upon by Defendants, in which the Supreme Court affirmed an order directing a presidential administration to spend money allocated by Congress for certain projects. 420 U.S. 35, 40 (1975). Here, by contrast, the Department of Justice asserts that Congress has not appropriated sufficient funds to remove all 11.3 million undocumented aliens, and several prior administrations have adopted programs, like DACA, to prioritize which noncitizens to remove. *See supra* n.2. "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws . . . ." *Cmty. for Creative Non-Violence v. Pierce*,

---

[11] Indeed, the Department of Justice's brief reports that the administration has removed approximately 2.4 million noncitizens from the country from 2009 to 2014, a number the government states is "unprecedented." Prioritizing those removal proceedings for noncitizens who represent a threat to "national security, border security, and public safety," Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, on "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (November 20, 2014), cannot fairly be described as abdicating the agency's responsibilities.

786 F.2d 1199, 1201 (D.C. Cir. 1986); *see Arpaio v. Obama*, 797 F.3d 11, 18 (D.C. Cir. 2015).

Further, as we have noted, the Supreme Court has acknowledged the history of the Executive engaging in a regular practice of prosecutorial discretion in enforcing the INA. *See Reno*, 525 U.S. at 483–84 & n.8 ("To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, . . . is now designated as deferred action." (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03 [2][h] (1998))). This history includes "general policy" non-enforcement, such as deferred action granted to foreign students affected by Hurricane Katrina, U.S. Citizenship and Immigration Services, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005), and deferred action for certain widows and widowers of U.S. citizens, Memorandum for Field Leadership, U.S. Citizenship and Immigration Services, from Donald Neufeld, Acting Associate Director, U.S. Citizenship and Immigration Services, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children" at 1 (Sept. 4, 2009).[12]

---

[12] The recent ruling in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) *petition for cert. granted sub nom. United States v. Texas*, — S. Ct. — , 2016 WL 207257 (U.S. Nov. 20, 2015) (mem.), is also inapposite to Defendants' constitutional claims. There, several states challenged the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA"), including DAPA recipients' eligibility for certain public benefits such as drivers' licenses and work authorization. *Id.* at 149. The court concluded that the states were likely to succeed on

We reiterate that, in the end, Arizona's policy is preempted not because the DACA program is or is not valid, but because the policy usurps the authority of the federal government to create immigrant classifications.

## IV.    Permanent Injunction

Before a court may grant a permanent injunction, the plaintiff must satisfy a four-factor test, demonstrating:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Plaintiffs have proven that they suffer irreparable injury as a result of Arizona's policy, and that remedies available at law are inadequate to compensate them for that injury. In particular, Plaintiffs have demonstrated that their inability to obtain drivers' licenses limits their professional opportunities. In Arizona, it takes an average of over four times as long to

their procedural and substantive claims under the Administrative Procedure Act, and expressly declined to reach the Take Care Clause issue. *Id.* at 146 & n.3, 149.

commute to work by public transit than it does by driving, and public transportation is not available in most localities. One ADAC member had to miss full days of work so that she could take her son to his doctors' appointments by bus. Another ADAC member finishes work after midnight but the buses by her workplace stop running at 9 p.m. And as the district court noted, another Plaintiff is a graphic designer whose inability to obtain a driver's license caused her to decline work from clients, while yet another Plaintiff wants to pursue a career as an Emergency Medical Technician but is unable to do so because the local fire department requires a driver's license for employment. *ADAC III*, 81 F. Supp. 3d at 809.

Plaintiffs' inability to obtain drivers' licenses hinders them in pursuing new jobs, attending work, advancing their careers, and developing business opportunities. They thus suffer financial harm and significant opportunity costs. And as we have previously found, the irreparable nature of this injury is exacerbated by Plaintiffs' young age and fragile socioeconomic status. *ADAC II*, 757 F.3d at 1068. Setbacks early in their careers can have significant impacts on Plaintiffs' future professions. *Id.* This loss of opportunity to pursue one's chosen profession constitutes irreparable harm. *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011); *see also Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 709–10 (9th Cir. 1988) (holding that plaintiff's transfer to a less satisfying job created emotional injury that constituted irreparable harm). Since irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages, *see Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991),

Plaintiffs have also shown that remedies available at law are inadequate to compensate them.

Plaintiffs have also demonstrated that, after considering the balance of hardships, a remedy in equity is warranted and that the public interest would not be disserved by a permanent injunction. We conclude that Arizona's policy is preempted by federal law. "[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (quoting *Arizona*, 641 F.3d at 366) (alterations omitted). The public interest and the balance of the equities favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

## CONCLUSION

In sum, we find that DACA recipients are similarly situated in all relevant respects to other noncitizens eligible for drivers' licenses under Arizona's policy. And Arizona's refusal to rely on EADs from DACA recipients for purposes of establishing eligibility for drivers' licenses may well violate the Equal Protection Clause for lack of a rational governmental interest justifying the distinction relied upon. Invoking the constitutional avoidance doctrine, we construe the INA as occupying the field of Arizona's classification of noncitizens with regard to whether their presence is authorized by federal law, and as therefore preempting states from engaging in their very own categorization of immigrants for the purpose of denying some of them drivers' licenses. Plaintiffs have shown that they suffer irreparable harm from Arizona's policy and that remedies at law are inadequate to

compensate for that harm.  Plaintiffs have also shown that a remedy in equity is warranted and that the public interest would not be disserved by a permanent injunction.

Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of Plaintiffs.  We also **AFFIRM** the district court's order entering a permanent injunction that enjoins Arizona's policy of denying the EADs issued under the DACA program as satisfactory proof of authorized presence under federal law in the United States.

**AFFIRMED.**

BERZON, Circuit Judge, Concurring in light of the Dissent from the denial of rehearing en Banc:

I join the panel opinion in full.  I write in concurrence to further explain our holding in light of the dissent from denial of rehearing en banc.

I write first to emphasize that the "law" that has preemptive power over Arizona's policy is Congress' conferral of exclusive authority on the executive branch to defer removal of individuals who lack legal status and to authorize them to work while temporarily permitted to remain.  Furthermore, I write to highlight that the preemption issues ultimately decided in this case can be viewed as embedded in the equal protection analysis, given the historical and conceptual overlap between equal protection and preemption concerns in cases involving state laws that affect immigrants.  The serious equal protection concerns raised by Arizona's policy bolster our preemption holding, which was reached in a careful exercise of the principle of constitutional avoidance.

I.

As the panel opinion makes clear, it is the *authority* specifically conferred on the Attorney General by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the associated regulations, that is the body of federal law that preempts Arizona's policy, not any particular exercise of executive authority.  The INA, as implemented by authorized regulations, affirmatively permits the Attorney General to decide whether undocumented immigrants should be removed from the country and when, and also whether they should be authorized to stay and to work if they are not

to be immediately removed.  Contrary to the Dissent from the denial of rehearing en banc ("Dissent"), this conferral of authority is not limited to "only two small provisions of the INA." Dissent at 10. *See e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (indicating that certain visa applicants are "eligible for deferred action and work authorization"); *id.* § 1182(a)(9)(B)(ii) (providing that for purposes of determining inadmissibility, unlawful presence includes any time an alien "is present in the United States after the expiration of the period of stay authorized by the Attorney General"); *id.* § 1227(d)(2) (indicating that certain visa applicants who are denied an administrative stay of removal can apply for "a stay of removal, deferred action, or a continuance or abeyance of removal proceedings"); *id.* § 1229b (giving the Attorney General the discretion to cancel removal for certain inadmissable or removable aliens, including those who were never lawfully admitted); *id.* § 1324a(h)(3) (defining an "unauthorized alien" for purposes of employment as an alien who is neither "lawfully admitted for permanent residence" *nor* "authorized to be so employed by [statute] or by the Attorney General"); REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 202(c)(2)(B)(viii), (C)(ii), 119 Stat. 231, 313 (indicating that persons with "approved deferred action status" are present in the United States during a "period of authorized stay" for purposes of issuing state drivers' licenses and identification cards); 8 C.F.R. § 274a.12(c)(14) (indicating that an "alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority" may be granted work authorization upon application and a showing of economic necessity).

These various provisions, among others, make clear that Congress has expressly authorized the Attorney General, at

his discretion, officially to defer removal of individuals who lack legal status, thereby temporarily authorizing their stay, and to authorize such individuals to work while temporarily permitted to remain.[1] *See Arizona v. United States*, 132 S. Ct. 2492, 2506 (2012) ("[T]he removal process is entrusted to the discretion of the Federal Government.").

The Attorney General granted the plaintiffs in this case deferred action and furnished them with federal employment authorization documents.[2]   Arizona's denial of drivers' licenses to DACA recipients rests on the premise that their presence is *not* "authorized under federal law," even though the federal government has decided otherwise, exercising the

---

[1] Authorizing someone to work in the country is necessarily to authorize their presence. The Supreme Court, in *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 416 (1948), stated that "[t]he assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work." (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)). The obverse is also true: Authorizing an alien to work in the country is necessarily authorizing him to remain.

[2] I note that the Dissent at 7 points treats this case as parallel to *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court,* 136 S. Ct. 2271 (2016) (per curiam). It decidedly is not. Arizona raised in the district court no affirmative challenge to the Deferred Action for Childhood Arrivals ("DACA") program, whether based on administrative law concepts or the scope of the executive's responsibility to enforce federal laws. *Compare id.* at 149. (Arizona is a plaintiff in the *Texas v. United States* litigation, which does raise such issues and is ongoing.).   Instead, Arizona has asserted the authority to treat some undocumented individuals with deferred status and federal work authorization differently from others with the same federal dispensations. It is the validity of that *differential* treatment that is at the heart of this case.

powers delegated to it by Congress. Arizona has, therefore, intruded into an area of decisionmaking entrusted to the federal government.[3]

## II.

Critically, our preemption holding reflects a careful exercise of constitutional avoidance, based on the serious equal protection concerns raised by Arizona's policy. Although we rest our decision on preemption grounds, the preemption and equal protection concerns raised in this case are overlapping rather than distinct. And because that is so, I am convinced that although we wisely did not decide the equal protection issue, were it necessary to decide the question I would have held that there was an equal protection violation.

Equal protection and preemption concerns have long been intertwined in cases dealing with state laws that classify immigrants. *See Plyler v. Doe*, 457 U.S. 202 (1982); *Nyquist v. Mauclet*, 432 U.S. 1 (1977); *Graham v. Richardson*, 403 U.S. 365 (1971); *Takahashi*, 334 U.S. 410; *Truax*, 239 U.S. 33; *see also* Jenny-Brooke Condon, *The Preempting of Equal Protection for Immigrants?*, 73 Wash. & Lee L. Rev. 77 (2016); David F. Levi, Note, *The Equal Treatment of Aliens: Preemption or Equal Protection?*, 31 Stan. L. Rev. 1069 (1979).

---

[3] Arizona's driver's license statute turns upon whether an immigrant's presence is "authorized under federal law" not whether the presence is "lawful" in the sense of specifically condoned by statute. *See* Ariz. Rev. Stat. Ann. § 28-3153(D). If the statute turned on the latter, Arizona could not, as it does, issue licenses to many undocumented individuals who do not have lawful status but have been granted work authorization while in removal proceedings. *See* Amended op. 29.

For example, in *Nyquist v. Mauclet*, the state asserted that one of its goals in excluding certain classes of aliens from eligibility for in-state tuition was to provide incentives for aliens to naturalize. 432 U.S. at 9–10.  In holding the state law violated the Equal Protection Clause, the Court found that state purpose "not a permissible one for a State" because "[c]ontrol over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere." *Id.* at 10.  Similarly in *Graham v. Richardson*, another decision that rested on equal protection grounds, the Court provided that "[s]tate alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a [state] right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible." 403 U.S. at 380. *Takahashi v. Fish and Game Commission* likewise held that "[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with [the] constitutionally derived federal power to regulate immigration."  334 U.S. at 419.

The overlap evident in these cases between the equal protection and preemption analyses where state laws that affect immigrants are at issue is no accident.  As the equal protection analysis in the panel opinion illustrates, both the "similarly situated" and "legitimate state interest" inquiries required for equal protection analysis necessarily incorporate recognition of the preeminent, although not exclusive, federal

role in immigration matters, the same role distribution emphasized in immigration preemption cases.[4]

A.

The primacy of federal immigration law first informs the equal protection analysis when we are determining whether the groups being classified are "similarly situated." As the panel opinion states, the Equal Protection Clause prevents the government from "treating differently persons who are *in all relevant respects* alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added). "*Relevant* respects" are only those respects that relate to the goals of the challenged state law.

Classifications adopted by states "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 76 (1971) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Accordingly, to adopt a federal immigration classification "as a criterion for its own discriminatory policy, the State must demonstrate that the classification is reasonably adapted to *the purposes for which the state desires to use it*." *Plyler*, 457 U.S. at 226 (internal quotation marks and citations omitted) (emphasis in original). Those purposes do not properly include making

---

[4] Because preemption concerns are embedded in and addressed by equal protection decisions regarding state laws that affect immigrants, equal protection decisions like *Plyler v. Doe*, 457 U.S. 202, *are* relevant to our preemption holding. *See* Condon, *supra* pp. 5, at 83 ("[T]he Supreme Court has reinforced the principle that the federal government has exclusive responsibility for the regulation of immigration, as much through its equal protection jurisprudence as it has through preemption decisions.").

decisions about who should remain in this country, who should be removed, or what are the conditions of stay for those temporarily authorized to be here.

For example, in *Graham v. Richardson*, the Court struck down on equal protection grounds a state law that denied welfare benefits to non-citizens whom the Court found similarly situated in all respects *relevant* to the state welfare law: non-citizens paid taxes, could be called into the armed forces, and worked in the state, thereby contributing to the state's economic welfare. 403 U.S. at 376.  The groups of residents were "indistinguishable except with respect to whether they are or are not citizens of this country." *Id.* at 371.  The two groups were not, of course, similarly situated in the latter respect — that is, as to whether they were citizens.   And that difference entailed many embedded distinctions between the non-citizens and citizens, including the right to vote, to serve on juries, and to remain in the country even if engaged in criminal activities.   But the citizen/non-citizen distinction was the one that the state had to *justify*, not a basis for declaring the two groups not similarly situated with regard to receiving welfare benefits.

Similarly, the immigration-related distinction between the plaintiffs and other undocumented immigrants has no role in this case at the "similarly situated" juncture.[5]   Rather, the pertinent comparisons at this stage concern the *other* requirements for obtaining drivers' licenses — Are the applicants old enough? Can they pass the written test? Can

---

[5] The panel opinion makes this basic point, briefly. Amended op. at 23. It then goes on for completeness to answer the state's similarly situated argument on its own terms, which stressed immigration status differences between the plaintiffs and other aliens. Amended op. at 23–29.

they pass the driving test? Have they violated driving laws in the past, as by driving without a license or while drunk?  The immigration-related classification is the one the state must *justify* at the next stage of equal protection analysis, not the measure of whether the plaintiffs are *otherwise* similarly situated with regard to obtaining drivers' licenses.

B.

Preemption themes next surface in the equal protection analysis in the examination of *legitimate* state interests.  A state interest is only legitimate for equal protection purposes when it lies within an area of concern within the state's authority.  When the state law touches on immigration, the ambit of legitimate state concern is constrained by the federal government's preeminent power directly to regulate immigration — that is, to decide who will be admitted, who may remain, and who will be removed.

As stated in *Plyler v. Doe*, "[a]lthough it is a routine and normally legitimate part of the business of the Federal Government to classify on the basis of alien status and to take into account the character of the relationship between the alien and this country, only rarely are such matters relevant to legislation by a State." 457 U.S. at 225 (internal quotation marks and citations omitted).  Consistently with this view, *Mathews v. Diaz* explained that "a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business." 426 U.S. 67, 85 (1976).

For this reason, the Supreme Court has long recognized that federal power over immigration constrains a state's *legitimate* interests in classifying groups of immigrants differently from one another and then disadvantaging one of the groups so classified. In *Truax v. Raich*, 239 U.S. at 42, for example, the Court admonished that "reasonable classification implies action consistent with the legitimate interests of the state, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power." *Truax* involved an equal protection challenge, by an alien lawfully admitted into the United States, to an Arizona law that required certain employers to hire a majority of workers who were qualified electors or native-born United States citizens. *Id.* at 40. *Truax* rejected the argument that the state's prioritization of citizens for employment was justified by the state's power "to make reasonable classifications in legislating to promote the health, safety, morals, and welfare of those within its jurisdiction," because the state lacked "the authority to deal with that at which the legislation is aimed." *Id.* at 41, 43; *see also Takahashi*, 334 U.S. at 420 (noting the "tenuousness of the state's claim that it has power to single out and ban its lawful alien inhabitants . . . from following a vocation simply because Congress has put some groups in special classifications in exercise of its broad and wholly distinguishable powers over immigration and naturalization.").

States assuredly *do* have authority to regulate employment, just as they have authority to regulate the distribution of drivers' licenses. The state authority lacking in *Truax*, and here, is the authority to justify discrimination as to areas *within* state power on grounds that are *beyond* state

authority because exclusively within the authority of the federal government.

For these reasons, equal protection analysis with regard to state laws, like Arizona's, that disadvantage some aliens compared with others necessarily incorporates distribution-of-authority concerns that directly parallel those encountered in preemption analyses. It is in light of this overlap between preemption and equal protection analyses in the immigration context that the panel's equal protection analysis evaluated the proffered state interests said rationally to justify the denial of drivers' licenses to the plaintiffs. And it is in this light that we rejected any state justification for the classification in state law that suggested an intent to preclude or discourage the plaintiffs from remaining and working even though the federal government allowed them to do so. For the same reason, we rejected any justification that turned on immigration status distinctions with no connection to state-drivers'-license-related concerns (such as the distinction between aliens holding work authorization *while* in removal proceedings and DACA recipients holding work authorization but *not* in the process of being removed). Amended op. at 28–29, 33, 36. We then concluded that the remaining rationales Arizona provided simply are not reasonable. Amended op. at 29–33.

In short, the preeminent federal role in immigration matters thus not only underlies our ultimate preemption holding, but also directly informs the equal protection analysis. Given the constraints on a state's *legitimate* interests in classifying groups of immigrants, we could, in my view, have rested our rejection of the challenged Arizona statute simply on a rational basis equal protection analysis (without reaching the question whether a more stringent

standard of review applies). Were it necessary to reach the question, I would have held Arizona's application of its drivers' license statute invalid as a denial of equal protection to DACA recipients, as compared to other *undocumented* individuals to whom Arizona does provide drivers' licenses. *See* Amended op. at 29–33.

The Dissent brushes past these equal protection concerns, regarding them as an "excursus," and even suggesting that over a century of equal protection jurisprudence regarding state immigration regulations, beginning with *Truax* in 1915, be overturned. Dissent at 8–9 n.1, 13 n.5.

But the panel's methodology — a careful analysis of the strength of a constitutional challenge, before turning to an alternative that avoids definitely deciding that constitutional question — is one with a long pedigree, grounded in judicial restraint. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690–96, 699 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575–78 (1988).[6] To criticize the panel's preemption analysis in a vacuum, with little recognition of the constitutional avoidance rationale underlying it, is tantamount to lopping off the first five floors of a ten story building and then declaring that the building, thus truncated, is unstable.

Again, I concur fully in the panel opinion. In addition, in my view, as we held in the preliminary injunction appeal,

---

[6] This court has observed that *DeBartolo* reached a statutory holding only "[a]fter considering at some length, but not deciding, the [constitutional] arguments." *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1209 (9th Cir. 2005).

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1067 (9th Cir. 2014), and as the district court held as the basis for the final injunction, *Arizona Dream Act Coalition v. Brewer*, 81 F. Supp. 3d 795, 808 (D. Ariz. 2015), the equal protection challenge is independently valid and, if we needed to reach it, would justify our conclusion that Arizona's denial of drivers' licenses to DACA recipients cannot stand.